*Supreme Court—General Term—Second Department.*

*December,* 1884.

PEOPLE *v.* RILEY.

CIRCUMSTANTIAL EVIDENCE.—MURDER.—MISCONDUCT OF JURY.

A jury is never required to find that it was not possible for another to have
    committed the crime before they can convict the prisoner on trial. It
    is enough that all the material circumstances point to guilt, and that

they are inexplicable on the theory of innocence. The guilt must be established beyond a reasonable doubt, not beyond a possible doubt.

Accordingly *held*, after an exhaustive review of the evidence, which was wholly circumstantial, that on the whole case, the jury were warranted in finding defendant guilty of murder in the second degree.

Under section 542, Code Crim. Proc., a verdict of guilty is not vitiated by the fact that a juror asked a question of the sheriff which was answered by him, the defendant being in no way prejudiced by the circumstance.

APPEAL by defendant James H. Riley, from a judgment of the Court of Oyer and Terminer of Putnam county convicting him of the crime of murder in the second degree.

The facts are fully stated in the opinion.

*F. W. Barnum*, district attorney, for the people.

PRATT, J.—The defendant was convicted at the Putnam Oyer and Terminer of the crime of murder in the second degree, for the killing of one Mrs. Hannah Sunderlin.

Mrs. Sunderlin, at the time of her death, and for a considerable number of years prior thereto, had resided alone in the town of Patterson, Putnam county. Some time before the death of Mrs. Sunderlin, the defendant, James H. Riley, had been in the employ of Isaac P. Rogers, a farmer, and resided in the tenant house on Roger's farm, very nearly opposite the house where Mrs. Sunderlin then and at the time of her death, resided. About five o'clock in the afternoon of Tuesday, March 27, 1883 (election day in the town of Patterson), Mrs. Sunderlin was seen outside and near her house, in her usual good health. The next day she not being seen about her premises, her near neighbors, the Rogers family, undertook to ascertain the reason of her non-appearance, and the daughter-in-law of Isaac P. Rogers went to the house of Mrs. Sunderlin. She entered the house by the back door, which she found not fastened, passed to the kitchen, into a sitting-room and to the door of Mrs. Sunderlin's bed-room; this was about three o'clock in the afternoon. She saw Mrs. Sunderlin in her bed, thought something was wrong, thought she saw blood on her face, was

greatly alarmed, and called for help.   Her mother-in-law, Mrs. Mary E. Rogers, who was with her son Hiram at their residence, heard the cry for help, ran over across the orchard to Mrs. Sunderlin's north door (back door), entered the house and passed directly to Mrs. Sunderlin's bed-room, and there found Mrs. Sunderlin "lying upon her bed in a diagonal position ; her face was very much swollen and discolored by the blood that had flown over and dried ; she looked like a colored person ; upon her head was a handkerchief and cap tied."   The son followed his mother almost immediately to Mrs. Sunderlin's, and the two raised Mrs. Sunderlin up.   She was living, breathing heavily and insensible, and her hands were tied with a cord.   She made no response to them when called by name, and showed no sign of understanding while she survived, and during that night she died.

On the day following, a *post-mortem* examination was made. At the time the blow or blows were struck which caused death, Mrs. Sunderlin had a night-cap on her head, and a handkerchief "folded three cornered and tied under her chin, and whatever instrument was used was struck on that."   On the *post-mortem* it was found : "A fracture from the top of the head over through the roof of the right eye, . . . and back to the opening where the spinal cord comes out of the brain ; showing that there was only about five inches, I should think, of skull on the back side that held the head together.   Literally split open, her head was."   Dr. Pierce, who thus testifies, also stated as follows as to the instrument with which the injury was inflicted.   When asked whether the wounds could have been made with the head of an axe he stated : "I should think likely it was something as heavy as that."   On cross-examination, by prisoner's counsel, the doctor stated as follows : "An injury like that would depend upon the weight of the instrument, and upon the force with which the blow was inflicted ; the more powerful the blow that was inflicted the less weight of the instrument.   There are plenty of instruments heavy enough to do it.   It must have been a blunt instrument. There was no cut . . it was broken, the skin was bruised, an irregular wound.   I saw a hammer there that night ; we looked at it, or looked for blood on it.   I do not think it could have

been done with a hammer. Q. ' Well, could not a blow, a heavy blow with a hammer, break the skull ?' A. ' Oh, yes ; but not so extensively as that, I do not think.' Q. ' Do you mean to say that a blow with a nail hammer in the hand of a man of ordinary strength could not have been inflicted with force enough to have crushed that skull ?' A. ' It would not have produced any such fracture. It would break right through the skull instead of producing so extensive a fracture.' "

Dr. Lewis G. Knox, the surgeon having immediate charge of the *post-mortem* examination, described the injury causing death, as follows : " I discovered two fractures of the skull, one in the front part of the head, and another in the back. The one on the back of the head extended through to the large opening in the back part of the skull, called the *framen magnum*. The first on the head crushed in the skull ; one split ran through the eye and the other up in the opposite direction, so that it left a triangular piece of bone in this condition."

It is evident from the description of the injury to Mrs. Sunderlin, that the blow or blows which produced it, were inflicted with a heavy blunt instrument, and that it might have been produced by an axe.

The evidence in the case establishes the facts that the entry into the house of Mrs. Sunderlin was made by some one acquainted with her and with the premises entered, and was for the purpose of gain or plunder.

Undoubtedly the back door of the house was fastened at the time the assassin entered. Immediately after Mrs. Sunderlin was discovered in the injured condition above described, it was proved that the nails which had secured a pane of glass in a window near the back door had been taken out and laid on the sill of such window and there remained, and the pane of glass had been removed from the sash and carefully placed upon the ground leaning against the outside of the house just below the window. By the removal of this pane of glass the fastening of the window could have been, and probably in this manner was removed, and by reaching into this window, the north door could have been unlocked or unfastened. On entering Mrs. Sunderlin's kitchen, to which this north or back door gave

admission, at the table stood a chair, and in front of it on the table was a pie-plate and some crumbs of bread, giving the appearance that some one had very lately sat at this table and eaten pie and bread. And on entering the sitting-room it was discovered, that the bureau drawers and drawers of the secretary had been opened, rifled, and the things and papers therein were in confusion. It is true that the testimony does not show that any money was taken from the premises, but the fact appears that some money was afterwards found belonging to Mrs. Sunderlin lying on a high shelf in the pantry which had not been discovered by the person who had entered the premises and inflicted the injury of Mrs. Sunderlin.

Now the question next arising is, what facts are established in the case to connect the prisoner with this serious crime?

He was acquainted with Mrs. Sunderlin, and with the house and premises where she resided. He had lived opposite to her residence for about nine weeks, and knew that she resided alone. On the fifth of April, the defendant, at the sheriff's office in Danbury, Connecticut, when questioned on the subject, undertook to give information as to his whereabouts at and about the time this murder was committed. He made a full statement on the subject, which was taken down in writing, and after being written it was read over to him and was put in evidence on the trial.

In this statement he says: "I left my home in Greenhaven Monday morning, March 26, 1883, it was about six o'clock in the morning, I think. I walked to North Salem, N. Y., arriving there about sunset the same night. I went to the house of my brother-in-law, Frank Bowman, he lives in North Salem. Frank Bowman and I married sisters. I remained in Frank Bowman's from the time I went there on Monday, March 26, 1883, until Saturday, March 31, 1883. I did not leave the town of North Salem from Monday until Saturday above mentioned, except for a few hours Wednesday afternoon, March 28, 1883, when I went to Charles Bowman's, a brother of Frank Bowman, who lives between North Salem and Brewster's Station. While walking from Greenhaven to North Salem, I passed through West Patterson, on the New York

and New England Railway. I did not stop at or about West Patterson. I did not go nigh Patterson station. I did not meet any one I knew about Patterson. I did not talk to any one. I know where Gus Birch's place is near West Patterson station, but never was in the barns or houses on his place. I know Mrs. Sunderlin, an old lady who lives near Patterson. I was in her house on Saturday, March 24, 1883; I was there about one P. M. on that day; I made a call on her; she gave me some bread and butter and a piece of mince pie. I asked her how she was, she said 'pretty well.' I did not have much to say to her. I used to work for Platt Rogers, near Mrs. Sunderlin's house. This was some time ago; I cannot remember when. I did not call on Mr. Rogers; I don't know why, but I did not. I was on my way then from Danbury to Greenhaven. I had engaged to work for Mr. Rundel and went home to tell my wife about it. I was not at or about Patterson Tuesday, March 27, 1883; I was in North Salem, at my brother-in-law's, Frank Bowman. I carried nothing with me from Greenhaven to North Salem but a small shawl-strap. I did not have an axe; I am certain I did not. I would know if I did. I have not seen Mrs. Sunderlin since March 24, the Saturday I took the pie and bread there. I have not heard of her having any trouble. On Saturday, March 31, 1883, I and Frank Bowman left Salem at about 6 A. M., and walked to Danbury, Conn., arriving there at one P. M. I then went to Mr. Rundel, and went to work and have been there ever since."

From this statement and other testimony in the case, it is fully established that the prisoner was at the house of Mrs. Sunderlin; that she gave him and he there ate some bread and butter and a piece of mince pie. He says he was there on Saturday, March 24, about one o'clock. The testimony on the trial given by Frank Bowman, the prisoner's brother-in-law, Mary Bowman his wife, Jeremiah Shaw, Caroline Shaw, and Mrs. Elizabeth Dayton, satisfactorily establishes the fact that the prisoner was at Frank Bowman's house on Saturday, March 24, and started to go to Shaw's house at "Mud Sodam;" that he did go there, and remained at that house from Saturday noon, March 24, until Monday morning, March 26, between

eight and nine o'clock.   And Walter Bowman testifies that the prisoner agreed to meet him at the railroad depot at Brewster's on Sunday morning, March 25, and go with him by railroad to Greenhaven.   Walter was at the depot as agreed ; the prisoner did not come, and Walter went by train to Greenhaven.

The testimony given on the trial established the fact that the prisoner, after he was seen at Brewster's, Putnam county, on Monday morning, March 26, went from there to Green-haven ; and Walter Bowman, already named, testifies that Riley came to his house at Greenhaven in Dutchess county, Monday night, before he went to his (Riley's) own house, and that they played euchre.   Sarah Riley, the prisoner's wife, testified that Riley came home Monday at nine or ten o'clock, did not undress, and left their house at Greenhaven at three or four o'clock in the morning, and took with him some clothes in a shawl-strap, and an axe.   On his return from Greenhaven to Brewster's station, and which was also towards the residence of Mrs. Sunderlin, Moses Mear saw him on the railroad track car-rying an axe and a satchel.   It is very probable that the satchel which he was afterwards seen to have, was obtained after he left his house in some manner, as he had none when he left there.   And the fact that he had a satchel does not seem to be disputed by any evidence in the case.   Mrs. Helen Holmes saw the prisoner on Tuesday, March 27, at West Patterson, going in the direction of Birch's barn, one half or three quarters of a mile from Mrs. Sunderlin's.   He had an axe and satchel with him.

John Utter testifies that on Tuesday afternoon, about four o'clock he went to the mow of Birch's barn to fodder the cattle ; saw some-one there covered with a coat ; on being spoken to he raised up and looked at him ; and that the person he saw there and who raised up, was the prisoner Riley, and he saw the handle of an axe near him, the axe being covered but the handle in sight.   On raising up, Riley stated he was going to Brewster's, and Utter then said to him that the six o'clock train would be going pretty soon, and Riley answered : " Yes, and I must be getting out of here," as the train came along at six o'clock.   The witnesses, Mrs. Holmes and John Utter, went to Danbury, Connecticut, before the arrest of Riley, and both

on seeing him there fully identified him as the colored man they had seen, as stated by them, on Tuesday, March 27.

No trace of Riley's whereabouts is given from the time he was seen in Birch's barn near six o'clock Tuesday afternoon until Wednesday morning, nine oclock, when he was seen by Jeremiah Shaw near Brewster's station going north towards Shaw's house, and Mrs. Shaw, Mrs. Dayton, and John Davis, by their testimony establish the fact that he was at Shaw's house and remained there until Wednesday afternoon, when he left. Frank Bowman, Walter Bowman, and Frank Bowman's wife, by their testimony on the trial establish the fact that he reached North Salem Wednesday afternoon, and remained there until he went to work for Mr. Rundle on Saturday, March 31, 1883.

The testimony shows that when the prisoner said he left his house in Greenhaven, Dutchess county, "Monday morning, March 26, about six oclock," he stated an untruth. He in fact left Tuesday morning, at three or four o'clock, and Tuesday night the fatal injury was done to Mrs. Sunderlin.

When he stated that on Monday he walked to North Salem, and went to the house of his brother-in-law, Frank Bowman, and remained there from Monday, March 26, until Saturday, March 31, 1883, and did not leave the town of North Salem from Monday until Saturday, except for a few hours Wednesday afternoon, when he went to Charles Bowman's, he stated what was not true, as he did not in fact reach the house of his brother-in-law Frank Bowman, until Wednesday afternoon, which fact is established by the testimony of Frank Bowman, Walter Bowman and Frank Bowman's wife, as already stated. The prisoner stated he was not in Birch's barn. John Utter testified that he was there and had an axe with him.

The prisoner admits that he was at Mrs. Sunderlin's. He makes no claim that he was ever there but on one occasion. He says he "made a call on her" and there ate some bread and butter and a piece of mince pie. The evidence in the case satisfactorily establishes the fact that if he was at Mrs. Sunderlin's at all (and he admits that he was), he was there Tuesday afternoon, as Mrs. Sunderlin received her fatal injuries Tuesday night. There on the table was the pie-plate and crumbs of

bread, and at the table stood the chair when on Wednesday, Mrs. Sunderlin was found in her bed, with her skull crushed in, her face covered with dried blood, and unconscious.

Riley states that he did not call on Mr. Rogers (for whom he formerly worked and in whose house he had formerly resided), the day he made his call on Mrs. Sunderlin ; as he states it, "I did not call on Mr. Rogers. I don't know why, but I did not."

Riley also declared in his statement, which was taken down in writing, that he carried nothing with him from Greenhaven (where his wife resided) to North Salem, but a small shawl-strap. He says "I did not have an axe. I am certain I did not. I would know it if I did." It was established on the trial, beyond controversy or dispute, that he took from the house an axe, carried it to Jerry Shaw's house, and there had it with him.

After the crime had been committed, examination was made about the premises of Mrs. Sunderlin, and tracks were found coming in the course and direction of Birch's barn to the back door and window of Mrs. Sunderlin's house. In making one of these tracks, the foot had been upon the ice but the feet had settled down into the mud ; the track was covered by those who found it, and subsequently a plaster cast was made of it, and after Riley's arrest, a boot taken from his foot was placed into the track, and, according to the testimony, the heel perfectly corresponded with the track made in the mud. And this boot heel was worn down on one side, and this wearing down was shown in the track and also by the plaster cast ; and the plaster cast and the boot taken from Riley's foot were both produced before the jury on the trial.

Mrs. Sunderlin's house was located on the corner of two highways, one of which led south towards Brewster's station, and the other, at right angles to the first-named road, led to New England Railroad track. Between Mrs. Sunderlin's house and the railroad track ran a small stream of water which on the highway was crossed by a bridge. The testimony given on the trial, is, that there were tracks corresponding with those already named, leading from the back of Mrs. Sunderlin's house through the lot down to this stream of water, and over which the person making that track had apparently jumped.

It is evident that whoever committed this homicide left the house by this back or north door, and in case he went to the railroad across the lot where the tracks were, all blood stains remaining upon "the heavy blunt instrument" with which the fatal blow was inflicted, could have been washed off in the stream named, and crossed by the fleeing criminal.

The witness John Davis, already named, testified that on Wednesday morning he saw the prisoner Riley in Shaw's barn; Shaw's daughter was present; that he had his axe in his hand scraping it, and stated that "he was scraping red paint off down in the eye of the axe." This testimony is entirely uncontradicted, although it would seem to have been within the power of the prisoner to contradict it by the Shaw girl, with whom the prisoner was on very friendly terms, in case the testimony thus given had not been true. But Miss Shaw was not called upon to dispute it, or to vary this account of the occurrence.

After Riley had made his statement as to his whereabouts at and about the time of the homicide, and after he had been identified by Mrs. Holmes and John Utter, he was arrested in Danbury, Conn., and on being told that he would have to be confined in prison at Danbury, Conn., or at Carmel in New York, he consented to accompany the deputy sheriff to the jail at Carmel. While being conveyed to Carmel, he requested Harris S. Crofutt, the deputy sheriff, to go to Mr. Rundel's stable, where Riley was at work immediately before his arrest, and get from him a pipe and a revolver, a song-book and a picture, and told him where they would be found. Sheriff Crofutt went to the barn and found the pipe on the top of the desk, and in one of the pigeon-holes of the desk he found a song-book and a picture, and he found the revolver. The picture lay on the bottom. There was a receipt which had been in the possession of Mrs. Sunderlin, and was a receipt to her for school taxes; and in the fold of this receipt were ten postage-stamps, which never had been used. Directly over the receipt inclosing the postage-stamps was the song-book (the receipt being between the song-book and the picture). The receipt is Exhibit D in case.

It is hardly necessary to make any comment upon these facts, except to say that they point to a moral certainty, to the

guilt of the defendant. It is established that he was in the vicinity just before the homicide was committed. He admits he was at her house and ate pie and bread, and the pie-plate and crumbs are found at the same time that Mrs. Sunderlin is found dead. The inference is irresistible that Mrs. Sunderlin was killed just before or immediately after the eating of the pie and bread, as the plate and crumbs were found precisely as left by the person who had eaten there. It was a case where the defendant could easily have proved where he was on that Tuesday night if he had been elsewhere than at Mrs. Sunderlin's. The story that he told of his whereabouts was proved to be false in almost every particular.

There are other small circumstances,—such as the tracks which the boots of the prisoner fitted, and the tax receipt to Mrs. Sunderlin,—which, taken separately and alone, do not furnish a high degree of proof, yet, when considered in connection, with all the proved circumstances in the case, point to a conclusion utterly inconsistent with the innocence of the defendant.

It now remains to allude to the rule of law applicable to this case. In Poole v. People (80 *N. Y.* 646), say the Court of Appeals : " Juries are not to deal with possibilities in such cases. Where a case depends upon circumstantial evidence, and in most other cases, a jury could not find that it was not possible for some one besides the prisoner to have committed the offense. A jury is never required to find that it was not possible for another to have committed the crime, before they can convict a prisoner on trial ; or, in other words, to find that it is impossible for the prisoner to be innocent. Such a degree of certainty is rarely attainable in the administration of justice. It is sufficient that all the material circumstances point to guilt, and that they are inexplicable upon the theory of innocence. The guilt must be established beyond a reasonable doubt, not beyond a possible doubt."

On the whole case, we think the jury were warranted in finding the verdict.

It is claimed that the verdict is vitiated by the fact that a juror asked a question of, and was answered by the sheriff. We do not think the authorities sustain this contention. However this question might formerly have been regarded, it is plain,

under the law as it now stands, it will not avail the defendant. Section 542 of the Code of Criminal Procedure provides, " That the appellate court must give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties." The defendant was in no way prejudiced by this circumstance.

We are of opinion the verdict was warranted by the evidence and that no injustice was done to the defendant.

Conviction and judgment affirmed.

BARNARD, P. J., and DYKMAN, J., concur.